UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
                                 :

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 1:14-CR-00179 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | ORDER & OPINION |
| | : | [Resolving Doc. No. 10] |
| SERGEI DAVIDOFF, | : | |
| | : | |
| Defendant. | : | |
| | : | |

-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

       The Government charges Defendant Sergei Davidoff with being an identify thief.  Davidoff moves to suppress evidence obtained during and after a search of his car.  Davidoff makes two arguments.  First, he argues that Ohio State Patrol Trooper Sergeant Timothy Timberlake did not have probable cause to pull Davidoff over for an alleged lane change violation.  Second, Davidoff says Sergeant Timberlake did not have probable cause to search Davidoff's vehicle based upon a dog alert for illegal drugs—an alert that was wrong—when the dog was arguably not properly certified.

       With this decision, we unfortunately return to another occasion where police stop a citizen for a traffic"infraction" that no police officer would normally enforce.  Sergeant Timberlake says he stopped Davidoff for improperly changing lanes on a mostly vacant interstate highway.  More probably, Sergeant Timberlake stopped Davidoff because Davidoff drove an older van with Arizona license plates, and this led Sergeant Timberlake to suspect Davidoff was trafficking drugs.

       But more important to this decision, this Court considers whether sufficient evidence gave

Case No. 1:14-CR-00179
Gwin, J.

Sergeant Timberlake probable cause to stop Davidoff's vehicle even if Davidoff suddenly shifted from a middle lane to the left lane of a three lane highway when no other vehicle was present or affected by the lane change.

This Court also considers Davidoff's argument that a drug sniffing dog could not give probable cause to search Davidoff's vehicle because the dog was arguably not currently certified. Although the dog gave a false signal for the presence of drugs—no drugs were ever found—the Court finds that the dog's alert was sufficiently reliable even though the dog had not been certified within the prior year.

The motion is **DENIED**.

## I. Background

On the morning of March 28, 2014, Defendant Davidoff drove his Arizona-registered van northbound on Interstate 71 when he was stopped by Sergeant Timberlake. Sergeant Timberlake had been parked in the median of the highway with the front of his patrol car perpendicular to the flow of traffic. Although parked in the median depression between the interstate lanes, Timberlake's vehicle was "slightly above the lane."[1]

As Sergeant Timberlake's vehicle parked in the depressed median strip, Sergeant Timberlake saw Davidoff's van approaching through his passenger window. Defendant drove past Sergeant Timberlake's patrol car "well below the posted speed limit" in the middle lane of a three-lane highway.[2] Somewhat illogically, Sergeant Timberlake testified that Davidoff's driving below the

---

[1] Suppression Hr'g Tr. 37:13, Aug. 14, 2014.
[2] *Id.* at 39:7.

Case No. 1:14-CR-00179
Gwin, J.

speed limit alerted him.[3/]  Sergeant Timberlake says that two to three seconds after Davidoff "cleared where [his] vehicle was sitting", Defendant's van swerved halfway into the left lane before "violently jerk[ing] back to the right."[4/]  Sergeant Timberlake testified that "one-half of the van went to the left over the lane line" but inconsistently testified that Davidoff's van crossed over the dashed lane lines for only a "millisecond" before Davidoff turned the van back to the middle lane.[5/]

If Sergeant Timberlake's testimony is accepted, Davidoff pulled into the left lane and quickly returned to the center lane between 176 feet and 264 feet after passing Sergeant Timberlake's patrol car.[6/]  No other vehicles were close enough to be affected by any lane change that Davidoff made.

Logic and experience make Sergeant Timberlake's description unlikely.  As Sergeant Timberlake acknowledges and consistent with most other drivers, Davidoff slowed his vehicle below the speed limit after seeing Sergeant Timberlake.  Having slowed his vehicle below the speed limit and after seeing a highway patrol car, nothing explains why Davidoff would suddenly shift into and then out of the left lane.  Having sought to avoid notice by slowing down, why would a driver then invite notice by suddenly shifting lanes?

Sergeant Timberlake testified that this lane shift caused him immediate concern for driver safety:  "I wasn't sure if the person was sick, I wasn't sure if he was drunk, wasn't sure if he was

---

[3/]*Id.* at 38:19-21. If Sergeant Timberlake's reason is true, it seems there is nothing motorists can do to avoid drawing the attention of the police. A driver that isn't guilty of speeding (and thus subject to being stopped for the traffic violation) could be pulled over for going suspiciously slow. Even a driver who is going exactly at the speed limit could be deemed suspicious under this logic, as she may be trying to avoid detection by controlling her speed to such a fine degree.

[4/]*Id.* at 39:21-25.

[5/]*Compare id. with id.* at 40:1-4.

[6/]Sergeant Timberlake testified that Defendant was driving well below the posted speed limit of 70 miles per hour. Even using a conservative estimate that Defendant was going 60 mph, he would have traveled approximately 88 feet per second, or about 176 to 264 feet past the stopped patrol car by the time of the alleged swerve.

-3-

Case No. 1:14-CR-00179
Gwin, J.

falling asleep. I just—I was concerned with the safety of the other motorists and him at that time."[7]

Although claiming concern for other motorist safety, Timberlake then pulled behind Davidoff and followed him for more than 108 seconds before pulling Davidoff to the side.

Sergeant Timberlake says that, while he was following Defendant, he observed Defendant twice drift into the right lane.[8] The traffic video taken by Sergeant Timberlake's vehicle does not support this testimony. The video shows Davidoff's vehicle traveling within his lane and shows Davidoff's vehicle's tires twice getting close to the lane divider lines, but does not show Davidoff's tires ever touching or crossing over those lines.

Nevertheless, Sergeant Timberlake stopped Defendant for the lane violations.[9]

Sergeant Timberlake approached the stopped van and asked Defendant to exit the car.[10] Defendant went to the rear of Sergeant Timberlake's vehicle.

About forty seconds after Defendant exited the vehicle, Ohio State Highway Patrol Trooper D.A. Norman arrived with his trained narcotics detection dog, Storm.[11] Sergeant Timberlake told Defendant that I-71 was known as an active corridor for trafficking drugs (which Sergeant Timberlake knew often came from southwestern states like Arizona[12]), and that he would have Storm sniff the car while he was checking Defendant's information.[13]

Trooper Norman took Storm around Defendant's van, and Storm passively alerted at the

---

[7]*Id.* at 40:13-16.
[8]*Id.* at 44:4-9.
[9]Doc. 16-1 at 2; *see also* Ohio Rev. Code § 4511.33–Rules for driving in marked lanes).
[10]Tr. at 48:22-25.
[11]Doc. 16-2 (video filed with the Clerk of Court on hard copy CD).
[12]Tr. at 47:22-48:6.
[13]Doc. 16-2.

Case No. 1:14-CR-00179
Gwin, J.

passenger door seam, indicating the presence of narcotics.[14]  Based on Storm's alert, Sergeant

Timberlake and Trooper Norman searched the van.[15]  They did not find any drugs, but they did find

credit cards, copies of driver's licenses, and a notary stamp with the names of people other than

Defendant.[16]  They also found a large number of gift cards and electronic equipment including

several cell phones, computers, flash drives, an inkjet printer/scanner, and camera equipment.[17]

The officers took Defendant into custody.  Defendant was charged with possessing with intent

to unlawfully use and transfer false identification documents, possessing identification document-

making implements, altering Social Security cards, access device fraud, and aggravated identity

theft.[18]

Defendant Davidoff moves to suppress the physical evidence seized from his van as well as

any subsequent statements he made.[19]  Defendant says that Sergeant Timberlake lacked probable

cause for the initial traffic stop because there was insufficient evidence at the time to suggest that he

had committed a lane violation.  Defendant also says that the dog sniff of his car lacked reliability

and thus could not be the basis for a probable cause search of his van.  The prosecution opposes the

motion.[20]  This Court held a hearing on this motion on August 14, 2014, at which testimony and

documentary evidence were presented.

---

[14]/Doc 16-1 at 7.

[15]/*Id.*

[16]/*Id.*

[17]/*Id.*

[18]/Doc. 19.

[19]/Doc. 10.

[20]/Doc. 16.

Case No. 1:14-CR-00179
Gwin, J.

## II. Legal Standards

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."[21] "[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of th[e] [Fourth] Amendment[], even though the purpose of the stop is limited and the resulting detention quite brief."[22] An automobile stop is reasonable where the police have probable cause to believe that a traffic violation has occurred.[23] If police officers have probable cause to believe that a vehicle has committed a traffic offense, the officers are entitled to stop the car even if they are actually motivated by some other reason.[24]

Whether probable cause exists "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."[25] The Court must determine "whether the officer's action was justified at its inception," and "whether it was reasonably related in scope to the circumstances which justified the interference in the first place."[26]

"A dog sniff conducted during a . . . lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth

---

[21] U.S. Const. Amend. IV.

[22] *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).

[23] *See id.* at 659, 661, 663.

[24] *See Whren v. United States*, 517 U.S. 806, 813 (1996) (rejecting argument that the "constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved"); *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) ("We focus on . . . whether this particular officer in fact had probable cause to believe that a traffic offense had occurred, regardless of whether this was the only basis or merely one basis for the stop.").

[25] *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

[26] *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000) (citing *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968)).

-6-

Case No. 1:14-CR-00179
Gwin, J.

Amendment."[27]  A trained police dog's alert to the presence of narcotics can create probable cause for a subsequent search of the vehicle if "all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime."[28]  In order to establish probable cause, the dog's alert must have been reliable, which may be demonstrated by evidence of the dog's training and certification.[29]

### III. Analysis

Although this is a close decision, the Court denies Defendant's motion.  Sergeant Timberlake's testimony that he stopped Davidoff's van for a lane change does not pass the laugh test.  He obviously stopped Davidoff's vehicle because it was a somewhat beaten-up van with Arizona plates.  But while Timberlake stopped the van to search without a warrant, the lane-change gave probable cause.  Specifically, the Court finds (1) there is sufficient evidence that probable cause existed to justify the initial traffic stop and (2) the dog sniff was reliable enough to establish probable cause for the search of Defendant's van.

### 1. Vehicle Stop

Sergeant Timberlake wrote in his report and testified that he saw Defendant swerve from the center lane halfway into the left lane.  As described above, testimony of a sudden lane change by a driver who knows he is almost adjacent to a trooper makes no sense.  Davidoff slowed as he approached Timberlake and no plausible explanation explains why he would sharply veer his vehicle

---

[27]/*Illinois v. Caballes*, 543 U.S. 405, 410 (2005).

[28]/*Florida v. Harris*, 133 S. Ct. 1050, 1058 (2013); *see also Carroll v. United States*, 267 U.S. 132 (1925) (warrantless vehicle searches are permitted under the Fourth Amendment if supported by probable cause).

[29]/*See United States v. Patton*, 517 F. App'x 400, 402-03 (6th Cir. 2013); *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994)* ("For a positive dog reaction to support a determination of probable cause, the training and reliability of the dog must be established."); *United States v. Trejo*, 551 F. App'x 565, 568-69 (11th Cir. 2014).

Case No. 1:14-CR-00179
Gwin, J.

into a different lane.  Recall, the stop took place in morning hours, without any explaining weather condition and without any explaining traffic condition.  Nothing suggests Davidoff had consumed alcohol or drugs that could affect his driving.  And the traffic video (taken after the supposed quick lane travel) shows normal driving.

But the Government gives testimony that Davidoff's vehicle shifted into and then out of the left hand lane when he passed Timberlake.  And Davidoff gives no conflicting evidence.

Sergeant Timberlake says he then saw Defendant twice cross from the center lane into the right lane, which  led to the traffic stop.  In support of these allegations, the Government offered Sergeant Timberlake's contemporaneous report,[30] his testimony, and the recording from his dash cam [31].

Although a close call, the lane shift provided justification to stop Defendant.  Ohio Revised Code § 4511.33 requires the driver of a vehicle to stay "as nearly as is practicable, entirely within a single lane or line of traffic" unless "the driver has first ascertained that such movement can be made with safety."  The Ohio Supreme Court has held that this "requires the driver to remain within the lane markings unless the driver cannot reasonably avoid straying."[32]  A driver is allowed to swerve to avoid hitting something—debris, another car, a person, etc.—but otherwise is required to stay in his lane.[33]  Mere "inattentiveness or carelessness" is insufficient justification for a swerve.[34]  To

---

[30]/Doc. 16-1.

[31]/Doc. 16-2.  In order to save hard drive space, dash cams in Ohio State Highway Patrol cruisers do not save all the digital video they record.  Once the officer activates the cruiser's lights and sirens, the dash cam will recover the previous approximately 90 seconds of video (but not any sound recording), and will from that point forward record and save both video and sound.  *See* Doc. 16 at 3 n.2.

[32]/*State v. Mays*, 894 N.E.2d 1204, 1209 (Ohio 2008).

[33]/*Id.* (citing *State v. Hodge*, 771 N.E.2d 331, 338 (Ohio Ct. App. 2002)).

[34]/*Id.*

Case No. 1:14-CR-00179
Gwin, J.

prove an actual violation, though, it is not enough that a swerve has occurred: the prosecution still must prove that the driver "failed to ascertain the safety of such movement prior to making the movement."[35]

Working chronologically backwards, the Court finds that no probable cause existed to stop Defendant for allegedly twice drifting onto the right lane line.  The Court's review of the dash cam video conclusively shows that Defendant's van did not even touch the dotted white line separating the middle and right lanes of the highway.  Although Ohio law is unclear as to whether merely touching the line is a violation or whether the tire must actually cross into the adjacent lane, neither happened here.[36]  As such, Sergeant Timberlake's stop would not have been justified at its inception if it were based solely on these observations.

However, there is still the first swerve to consider.  Sergeant Timberlake consistently said that he began following Defendant after he observed Defendant swerve into the left lane about two to three seconds after driving past the stopped patrol car.  If true, this would have created sufficient probable cause to stop Defendant.

The Ohio Supreme Court has held that "when an officer could reasonably conclude from a person's driving outside the marked lanes that the person is violating a traffic law, the officer is justified in stopping the vehicle."[37]  Because even a minor inadvertent slip over the line by a foot for a few seconds can constitute an infraction, Ohio courts have held that any movement out of one's

---

[35] *State v. Ross*, 990 N.E.2d 1127, 1130 (Ohio Ct. App. 2013).

[36] If this Court had needed to decide this issue, this Court would adopt the rule used in tennis: a ball having any contact with the painted line is considered within the court or, in this case, within the lane.

[37] *Mays*, 894 N.E.2d at 1209.

Case No. 1:14-CR-00179
Gwin, J.

lane can give police probable cause to stop the potentially offending vehicle.[38/] The officer can reasonably conclude that such a movement was made without ascertaining that it was safe, and therefore stop the car.[39/]

At the hearing on this motion, the Court questioned Sergeant Timberlake and the prosecution at length about Sergeant Timberlake's view of the road. No video exists of this alleged lane violation,[40/] so the only evidence the Court has to consider is Sergeant Timberlake's testimony and nearly contemporaneous report.

The Court has doubts regarding Sergeant Timberlake's ability to clearly see whether Defendant actually swerved into the left lane. Sergeant Timberlake testified that he was parked in the median, which is depressed a few feet in the middle to allow for drainage, and positioned perpendicular to the flow of traffic.[41/] This means that the front of his patrol car—a Ford Explorer SUV[42/]—would have been angled upward with the back below road level. Even from the high vantage point offered by an SUV, it would have been difficult to see that Defendant's car had drifted over the line by only a few feet when it was already 176 to 264 feet down the road..

Beyond whether Sergeant Timberlake was positioned to see Davidoff's vehicle, it was illogic for Davidoff to quickly pull into the left hand lane. No other traffic affected Davidoff. As he approached Sergeant Timberlake's patrol car, Davidoff slowed. He obviously saw Sergeant Timberlake. Having slowed in an effort not to give any reason to stop him, nothing explains why

---

[38/]*E.g.*, *State v. Frase*, No. L-10-1075, 2011 WL 766534, at *3 (Ohio Ct. App. Mar. 4, 2011).
[39/]*See Kinlin v. Kline*, 749 F.3d 573, 578-79 (6th Cir. 2014).

[40/]Even if the dash cam had been recording, it is likely that the camera would not have recorded Defendant's alleged lane violation, as the dash cam points straight forward, and Sergeant Timberlake observed the violation by looking through the front driver's side window. *See* Doc. 16 at 3 n.2

[41/]Tr. at 36:18-38:7.
[42/]*Id.* at 37:24.

-10-

Case No. 1:14-CR-00179
Gwin, J.

Davidoff would create grounds for a stop by quickly shifting lanes.

Despite the Court's doubts about Sergeant Timberlake's credibility, Defendant offered no evidence to challenge Sergeant Timberlake's story regarding this first swerve. And Sergeant Timberlake has consistently said that Defendant swerved after passing the stopped patrol car—he said so during the stop, he wrote it in the police report, and he testified to it at the hearing on this motion.

This is a close call, but the Court finds Sergeant Timberlake had probable cause to stop Defendant for the suspected marked lane violation.

Although the Government now suggests that two other possible traffic violations may have occurred,[43] the evidence indicates that the only justification offered for the stop at the time was the violation of Ohio Rev. Code § 4511.33. Sergeant Timberlake's report states that "[t]he suspect vehicle was stopped for failure to drive in marked lanes," and cites no other violation.[44] The Traffic Safety Reminder issued to Defendant by Sergeant Timberlake only cites a "marked lanes" violation under Ohio Rev. Code § 4511.33.[45] And Sergeant Timberlake testified that the stop was based on the marked lane violation—he only suggested other possible violations after being prompted by the Government's improper leading questions.[46]

But because the Court finds that probable cause existed to stop the Defendant for the possible marked lane violation, it need not decide whether Defendant may have also committed these other violations, or whether Sergeant Timberlake would have had probable cause to stop Defendant absent

---

[43]/*See* Doc. 16 at 2 (suggesting that Defendant also violated Ohio Rev. Code §§ 4511.39 – Improper Lane Change Without a Signal, and 4511.202 – Operation Without Being in Reasonable Control of the Vehicle).

[44]/Doc. 16-1 at 2.

[45]/Suppression Hr'g Def. Ex. 1, Aug. 14, 2014.

[46]/Tr. at 40:25-41:7, 49:23-50:5.

-11-

Case No. 1:14-CR-00179
Gwin, J.

the marked lane violation.[47]

### 2. Dog Sniff

Trooper Norman and his canine partner, Storm, arrived on the scene shortly after the stop.[48] After Defendant was placed in the back of Sergeant Timberlake's cruiser, Trooper Norman walked Storm around Defendant's van.  Storm's passive alert led the police to search Defendant's van for drugs.  No drugs were found but troopers discovered the evidence leading to the identity theft charges.

In his brief, Defendant argued that Storm is unreliable because no narcotics were found in the car.[49]  At the hearing on this motion, though, Defendant changed tactics and instead argued that Storm's certification had expired, and the police could not develop probable cause from his alert.

Under either theory, the question is whether Storm is reliable so that his positive alert would reasonably give probable cause for the subsequent search.

On April 11, 2012, Trooper Norman and Storm were certified as a Special Purpose Canine

---

[47]*See Devenpeck*, 543 U.S. at 152-54.

[48]The Government has suggested that Sergeant Timberlake first radioed for Trooper Norman after stopping Defendant and asking him to exit the van.  Doc. 16 at 4; Tr. at 49:3-4.  Although the dash cam video shows that Sergeant Timberlake radioed to Trooper Norman at this point, the Court believes it is unlikely that this was the first moment in this sequence of events when Sergeant Timberlake requested a canine unit to perform a drug sniff of Defendant's van. The radio call in the video occurred at 11:26:07 AM.  Forty-six seconds later, at 11:26:53 AM, Trooper Norman was in the video, standing next to Sergeant Timberlake.  Under the prosecution's theory, Trooper Norman would have traveled to the scene of the stop, parked his car behind Sergeant Timberlake's, and walked into the shot, all within the space of forty-six seconds.  This short time frame is hardly believable on its own terms.  And furthermore, Trooper Norman inconsistently testified that he only responded to the request for a canine unit "within minutes" of the initial call. Tr. at 103:12-14.  This undercuts the Government's theory, and suggests that Sergeant Timberlake had decided to perform a drug sniff of Defendant's car before activating his lights to pull over Defendant (otherwise the dash cam would have recorded the sound from the call).  Likely, Sergeant Timberlake suspected that Defendant was carrying drugs based on the van's beat-up condition and Arizona license plates.  But even if the Court's hunch is correct, *Whren v. United States*, 517 U.S. 806, 813 (1996), clearly holds that, for Fourth Amendment purposes, the reasonableness of the stop does not depend on the subjective motivations of the officers involved as long as they have probable cause to believe the motorist committed a traffic violation.  Because the Court has determined that probable cause existed for the initial stop, it does not matter when Sergeant Timberlake called for a canine unit, except as it further undermines his credibility regarding his observation of Defendant's initial swerve.

[49]Doc. 10 at 12-14.

-12-

Case No. 1:14-CR-00179
Gwin, J.

Unit under Ohio Admin. Code 109:2-7-05, with specialties in detecting marijuana, cocaine, heroin, methamphetamine, and their derivatives.[50] At the time this certification was issued, the regulation required them to be re-certified every two years. However, on June 22, 2013, the regulation changed to require yearly re-certification. Trooper Norman and Storm did not re-certify until May 14, 2014.[51] Therefore, there is a question as to whether Storm was properly certified on the date of the traffic stop: March 28, 2014.

The Government argues that the certification was valid on March 28, 2014, despite a change in the controlling Ohio regulation to require annual certifications. The regulation has an exemption for "unforeseen circumstances such as illness, emergency employment situation, or other valid reasons."[52] To qualify under this exemption, the agency employing the canine unit must have submitted a written request for the exemption, and the executive director must have granted it in writing.[53]

The Government offers letters from the Ohio Attorney General's office granting a blanket exemption to all certified canine units, and an opinion letter from that office (written after the hearing on this motion) that Trooper Norman and Storm's certification was valid at the time of this search.[54] The prosecution has not, however, provided the Court with the written request for an exemption. It is thus possible that, despite the Attorney General's opinion, the certification was indeed invalid.

But even if the certification had lapsed, the Court can still find that probable cause for the search existed. In *Florida v. Harris*, the Supreme Court explained that a district court must look at

---

[50]/Doc. 16-4.
[51]/Doc. 22-6.
[52]/Ohio Admin. Code 109:2-7-05(B).
[53]/*Id.*
[54]/*See* Docs. 22-1; 22-2; 22-3; 22-4.

Case No. 1:14-CR-00179
Gwin, J.

the totality of the circumstances to determine whether the dog's alert was reliable.[55]  Evidence that

the dog was properly certified after testing his reliability in a controlled setting leads to a presumption

that the dog's alert was reliable.[56]  But lack of certification does not in itself mean that the dog was

necessarily unreliable.  If the dog lacked the proper certification, the court must weigh all the

evidence presented by both parties to determine whether probable cause existed.[57]  "[E]ven in the

absence of formal certification, if the dog has recently and successfully completed a training program

that evaluated his proficiency in locating drugs," the dog may still be considered reliable.[58]

Here, Trooper Norman and Storm were certified in 2012.  They have engaged in a minimum

of 16 hours per month of ongoing training.[59]  And although no drugs were actually present in the van,

that does not require finding that Storm is unreliable.  A dog does not need a perfect record in the

field to be considered reliable; a better measure of reliability is his performance in controlled test

settings.[60]  Trooper Norman testified that Storm has been perfect in these controlled settings, and

further testified that this stop was the first time this year Storm had given a false positive indication

in the field.[61]

Based on this evidence, the Court finds that Storm's positive alert gave the officers probable

cause to search Defendant's van.

### IV. Conclusion

The Court reiterates that this is a close case with regard to the initial stop. There are problems

---

[55]133 S. Ct. at 1058.

[56]*Id.* at 1057.

[57]*Id.* at 1058.

[58]*Id.* at 1057.

[59]Tr. at 101:18-23.

[60]*Harris*, 133 S. Ct. At 1056-57.

[61]Tr. at 102:24-103:6.

-14-

Case No. 1:14-CR-00179
Gwin, J.

with the prosecution's story that suggest this Court has heard less than the whole truth regarding the

officers' observations and activities.  But in the end, the evidence is sufficient to support a finding

of probable cause.  Thus, for the foregoing reasons, the motion to suppress is **DENIED**.

      IT IS SO ORDERED.


Dated: September 3, 2014                      s/      *James S. Gwin*
                                                JAMES S. GWIN
                                                UNITED STATES DISTRICT JUDGE